The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR15-244 RAJ |
| Plaintiff, | |
| v. | GOVERNMENT'S TRIAL BRIEF |
| ROBERT RYAN POWELL, | |
| Defendant. | |

The United States of America, by and through Annette L. Hayes, United States Attorney for the Western District of Washington, and Catherine L. Crisham and Amy Jaquette, Assistant United States Attorneys for said District, respectfully submits this Trial Brief in the above-captioned case.

## I.     INTRODUCTION

Defendant Robert Powell is charged in a four-count Superseding Indictment with various crimes arising out of his sex trafficking of an adult female (B.M.) and his interstate transportation of two juvenile victims (C.C. and N.C.) for the purpose of prostitution. Specifically, Counts One and Two of the Superseding Indictment allege that in August 2014, the Defendant transported C.C. and N.C. from Washington to California for the purpose of prostitution, in violation of Title 18, United States Code,

GOVERNMENT'S TRIAL BRIEF - 1
*United States v. Powell*, CR15-244 RAJ

Section 2423(a).  Count Three of the Superseding Indictment charges the Defendant with using force, fraud, and coercion to compel B.M. to engage in commercial sex acts, in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1).  Count Four alleges that on June 4, 2014, the Defendant transported B.M. from Washington to Nevada through coercion and enticement for the purpose of prostitution, in violation of Title 18, United States Code, Sections 2422(a) and 2.

Trial is set to commence on June 14, 2016 at 9:00 a.m.  The government will be represented by Assistant United States Attorneys Catherine L. Crisham and Amy Jaquette.  The Defendant will be represented by Allen R. Bentley and Jesse Froehling.

The government expects to call twenty witnesses and to seek to introduce approximately one hundred exhibits, depending upon potential stipulations and this Court's evidentiary rulings.  The government anticipates that it will be able to present its case-in-chief in four to six trial days.

## II.  FACTUAL BACKGROUND

### A.  Initial Recruitment of B.M.

The government's evidence at trial will establish that Defendant Robert Powell, a longtime pimp known as "Fresh" or "Fresh the P," targeted young, vulnerable women and juveniles and recruited them to work as prostitutes for him.   Specifically, the evidence will show that in early 2014, the Defendant attempted to recruit adult victim B.M. by texting the phone number listed on her Backpage.com advertisement.[1]  At the time, B.M. was living in Seattle and supporting herself by working as a prostitute.  The Defendant, who had recently been released from prison for assaulting a prostitution client

---

[1] The government does not intend to offer into evidence any of B.M.'s Backpage.com advertisements that were posted before she was trafficked by the Defendant.  As set forth below, the government does intend to elicit from B.M. the fact that she was working as a prostitute when the Defendant first initiated contact with her through the phone number on a Backpage.com advertisement that she had posted.  This fact is necessary to explain how the Defendant first recruited B.M. to work for him as a prostitute – namely, by targeting her based on her Backpage.com advertisement.  Furthermore, the Defendant's behavior of recruiting B.M. online is also consistent with the *modus operandi* he employed with both C.C and the undercover officer he attempted to recruit in connection with his 2007 Nevada conviction. This evidence is admissible because it is "'intrinsic' to the alleged sexual misconduct'" and its "probative value . . . significantly outweighs possible harm to the victim."  *See* FRE 412 Advisory Notes.

GOVERNMENT'S TRIAL BRIEF - 2
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of a previous victim, was living in Las Vegas.  B.M. declined the Defendant's initial attempts to recruit her, but the Defendant continued to send her text messages asking her to come to Las Vegas and work for him.  After several weeks, B.M. eventually agreed to go to Las Vegas.  B.M. will testify that it was her understanding, based upon her conversations with the Defendant and her knowledge of how the prostitution industry works, that she would be required to give him all of her prostitution earnings.

In February 2014, B.M. sent money to the Defendant via Western Union, and he then used that money to buy her a plane ticket to fly to Las Vegas.  On B.M.'s first evening in Las Vegas, the Defendant slapped her after she jokingly touched his arm.  The slap left a mark, and B.M. became frightened of the Defendant.  The Defendant then instructed B.M. to post a prostitution advertisement on Backpage.com and to walk the prostitution "track."  Within hours, B.M. was arrested on an outstanding warrant for being a minor in a casino.  She called the Defendant, who refused to bail her out.  After she was released, B.M. contacted her mother to help her return to Seattle.  Southwest Airlines records confirm that B.M.'s mother paid for her to fly from Las Vegas to Seattle on March 3, 2014.

Once B.M. was back in Seattle, the Defendant continued to communicate with her and attempt to convince her to come back to Las Vegas and work for him.  B.M. will testify that in trying to convince her to return, the Defendant told her that he would not hit her or be aggressive again, and that it would be a better experience for B.M.  Based upon these promises, B.M. eventually agreed to return to Las Vegas to work for the Defendant.  B.M. will testify that at the Defendant's instruction, she traveled on several occasions across state lines for the purpose of engaging in commercial sex acts.  One of these trips – a June 4, 2014 flight from Seattle to Las Vegas – is the basis for Count Four.

After arriving in Las Vegas in June, B.M. continued to work for the Defendant as a prostitute.  Although the Defendant had promised B.M. that he would not hit or be aggressive with her again, he was in fact physically and emotionally abusive on a number

GOVERNMENT'S TRIAL BRIEF - 3
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of occasions.   Among other things, the Defendant made B.M. work every day and often accompanied her to the track to keep an eye on her.  The Defendant also told B.M. what type of outfits she had to wear (short skirts and high heels) and made her follow various "rules," including that she only engage in certain types of sexual activities and that she not talk to or engage in commercial sex acts with African-American men.  B.M. gave all of the money she earned from prostitution dates to the Defendant.  B.M. will testify that she was frightened of the Defendant, and what he might do to her, if she refused to work for him as a prostitute.  B.M. will also testify that she and the Defendant had a sexual relationship, and that she eventually developed romantic feelings for him.

B.M. will testify that she initially worked for the Defendant in Las Vegas. According to B.M., she usually arranged prostitution dates either by posting on Backpage.com or by walking the track on Tropicana Avenue.  B.M. will testify that the Backpage.com advertisements were posted by either by her or the Defendant.  The Defendant gave B.M. prepaid credit cards, which he bought with her prostitution earnings, to pay for her online advertisements.   The government will introduce records from Backpage.com that confirm that a number of advertisements featuring B.M. were posted in the Las Vegas market between June 30 and July 16, 2014.

At some point in July 2014, business became slow in Las Vegas, and the Defendant told B.M. that he wanted to take her to other states to prostitute.  B.M. will testify that the Defendant rented a car from a business called Charlie Cheap Car and drove her to Arizona, New Mexico, Utah, Idaho, and back to Nevada to work as a prostitute.  In each of these states, either B.M. or the Defendant would post an advertisement on Backpage.com.  B.M. will testify that she worked as a prostitute in each of these states, and gave all of her earnings to the Defendant.  To corroborate B.M.'s testimony, the government will introduce records from Charlie Cheap Car showing that on July 18, 2014, the Defendant rented a Chevy Cobalt for several weeks.  The government will also introduce records from Backpage.com showing that between July

GOVERNMENT'S TRIAL BRIEF - 4
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

22 and August 13, advertisements featuring B.M. were posted in Phoenix, Flagstaff, Albuquerque, Tucson, Las Vegas, Salt Lake City, and Boise, as well as hotel records showing that Powell had rented rooms in some of those states during that time frame.

After this multi-state trip, B.M. had earned enough money for the Defendant to buy himself a car.  They traveled to California with one of the Defendant's "pimp friends," who knew where the Defendant could place a down payment on a car.  The Defendant used B.M.'s prostitution earnings to put $3,000 down on the purchase of a silver BMW.

**B.    The Defendant Takes B.M. to Seattle and Recruits C.C. and N.C.**

After taking possession of the BMW, the Defendant told B.M. that he wanted to take her to Seattle to work as a prostitute.   B.M. will testify that the Defendant rented a room at the Studio 6 Motel in Mountlake Terrace, Washington, where she posted advertisements on Backpage.com and did prostitution dates.  To corroborate B.M.'s testimony, the government will introduce records from Backpage.com showing that on August 18, 2014, an advertisement featuring photographs of B.M. and titled "Call Now Jannessa . . . Your Favorite Little Spinner Is Back in Town" was posted in the "adult entertainment/escorts" section of the Seattle Backpage.com board.   That advertisement was re-posted nine different times between August 18 and August 21, 2014.  The government will also introduce records from the Studio 6 Motel that show that the Defendant rented room 269 from August 18 through August 21.  The vehicle listed on the hotel registration was a gray BMW.

After arriving in Seattle, B.M. became ill and was unable to work regularly.[2] B.M. will testify that the Defendant was angry that she was not earning enough money for him as a prostitute and that he told her that he was going to attempt to recruit some

---

[2] Pursuant to this Court's February 10 Order, the government is precluded from introducing evidence of B.M.'s pregnancy and abortion. *See* Docket No. 111 at 5-6.  Accordingly, the government will elicit only that B.M. was ill and reluctant to work as a prostitute for the Defendant, so as to provide the necessary factual context for the Defendant's recruitment of C.C. and N.C.

GOVERNMENT'S TRIAL BRIEF - 5
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

other females to work for him through Backpage.com.  The Defendant subsequently

called her and told her that he had found two recruits and was bringing them to the Studio

6 motel.

Victim C.C. will testify that on August 20, 2014, the Defendant sent her a friend

request on the social networking site Tagged.com under the username "Too Fre$h."  The

next day, C.C. was walking the prostitution "track" on Aurora Avenue in Seattle[3] when

the Defendant pulled up next to her in a silver BMW and began talking to her.  The

Defendant told C.C. that he recognized her because he had recently sent her a friend

request on Tagged.com, and invited her to take a ride with him.  C.C. agreed to do so.

C.C. also introduced her friend N.C. to the Defendant, and the three of them hung out and

drove around in his BMW.  At the time, C.C. was seventeen years old and N.C. was

sixteen years old.

At some point, the Defendant asked C.C. if she was into "making money," which

she will testify she knows to mean work as a prostitute.  The Defendant also told C.C.

that he knew she was a prostitute because he had seen her advertisement next to an

advertisement his "female" had posted.  The Defendant told the juveniles that he and his

"female" were planning on taking a road trip to California, and invited them to come

along.  Both C.C. and N.C. will testify that they were aware from the Defendant's

statements that he was a pimp and that his "female" worked for him as prostitute.

C.C. and N.C. will testify that the Defendant then took them to the Studio 6 motel,

where they met B.M.  According to C.C. and N.C., B.M. did not appear to be happy that

the Defendant had brought them to the hotel.  C.C. and N.C. will testify that the

Defendant had previously said that B.M. was working for the Defendant and providing

him with the money she earned from engaging in commercial sex acts.

---

[3] The government intends to elicit from C.C. the facts that the Defendant approached her when she was walking the Aurora Avenue "track" and told her that he had seen her Backpage.com advertisement.  This evidence is admissible because it is "'intrinsic' to the alleged sexual misconduct'" and because it establishes both the Defendant's targeting and recruitment of C.C. and the Defendant's intent to take C.C. and N.C. to California to work for him as prostitutes. *See* Advisory Notes to FRE 412.

GOVERNMENT'S TRIAL BRIEF - 6
*United States v. Powell*, CR15-244 RAJ

1   B.M. will corroborate that the Defendant introduced her to C.C. and N.C. at the

2   Studio 6 motel, and that he subsequently told her that he was going to take them to

3   California to prostitute.  B.M. got into an argument with the Defendant, and told him that

4   she was going to go to her mother's house instead of traveling to California.   The

5   Defendant took her phone and told her that if she insisted on leaving, he was going to

6   send her out the door naked.   B.M. then left the Defendant and went to her mother's

7   house.

8        While at the Studio 6 motel, the Defendant rented another room for C.C. and N.C.

9   He told them that they should set up some prostitution dates and "break off" some of the

10  money they earned to give to him.   The Defendant also gave B.M.'s phone to C.C. and

11  told her that he wanted her to set up dates with potential customers who were responding

12  to B.M.'s Backpage.com advertisements.  C.C. will also testify that she engaged in

13  commercial sex with a customer that did not contact her through Backpage.com.[4]  Both

14  C.C. and N.C. engaged in commercial sex acts at the hotel and provided a portion of their

15  earnings to the Defendant.   Studio 6 records confirm that on August 21, 2014, the

16  Defendant rented Room 218 for one night.

17  **C.      Transportation of C.C. and N.C. to California**

18       After spending the night at the Studio 6 motel, the Defendant took C.C. and N.C.

19  to San Jose, California.  They drove straight through from Seattle in the Defendant's

20  silver BMW.  C.C. and N.C. will testify that they understood that they would be engaging

21  in commercial sex acts while in California, although they also hoped to relax and enjoy

22  themselves.   C.C. will testify that at some point during the drive, when N.C. was

23  sleeping, the Defendant began talking with her about C.C. continuing to work for him as

24  a prostitute.  He said that he and B.M. had traveled to many different cities and earned a

25

26  _____

27  [4] As set forth below, the government intends to elicit the fact that C.C. engaged in a commercial sex act with one of
    her previous prostitution customers on the evening of August 21 and gave the Defendant the money she earned.
28  This evidence is "intrinsic" to the charged crimes because it directly evinces the Defendant's intent to transport C.C.
    for the purpose of prostitution.  *See* Advisory Notes to FRE 412.

GOVERNMENT'S TRIAL BRIEF - 7
*United States v. Powell*, CR15-244 RAJ

lot of money, and that he and C.C. could do the same thing.  C.C. will further testify that about halfway through the trip to California, the Defendant began talking about being low on cash and that he was going to need C.C. and N.C. to "make money" for him.  C.C. interpreted this to mean that the Defendant expected them to make money by working as prostitutes, since she had no other way of earning money.

The group arrived in San Jose on the evening of August 23, and Powell rented two rooms at the San Jose Airport Garden Hotel.  Although they initially spent time swimming in the hotel pool, Powell soon became aggressive towards C.C. and N.C, demanding that they go out on the streets and find dates on the track.  He told C.C. and N.C. they had to work because he was broke and warned that they would have to sleep outside unless they earned money through prostitution.  C.C. and N.C. will testify that although they expected to post advertisements on Backpage.com, they did not want to walk the track.  The Defendant responded that he had heard that Backpage.com was "slow" in San Jose, and insisted that they walk the track.

Later the first night, the Defendant drove C.C. and N.C. to the track.  Prior to dropping them off, the Defendant told C.C. and N.C. his rules, which included keeping their heads down and not talking to African-American men.  The Defendant also insisted that C.C. wear extremely uncomfortable high heels while walking.  While C.C. and N.C. were at the track, the Defendant drove around the area and watched them to make sure they were attempting to get dates.  The Defendant made C.C. and N.C. stay at the track until 3 or 4 a.m., when he finally drove them back to the motel to sleep.  C.C. will testify that she engaged in commercial sex acts with several customers and gave her earnings to the Defendant.   She will also testify that N.C. did not want to walk the track.  C.C. felt guilty for getting N.C. in the situation, so she told N.C. that N.C. did not have to prostitute and that C.C. would earn enough money for both of them.

The next day, the Defendant decided that they should switch hotels and rented a room at the Hotel Elan.  Hotel Elan records will confirm that Robert Powell rented room

GOVERNMENT'S TRIAL BRIEF - 8
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

116 on August 24, 2014, and checked out the next day.  During this day/night, both C.C. and N.C. conducted several prostitution dates and gave most of their earnings to the Defendant.   The Defendant was angry at the amount of money they gave him, and told C.C. that he knew she could be earning more.  At the end of the night, the Defendant bought the juveniles some marijuana.  N.C. will testify that the marijuana was extremely potent, and that the Defendant was encouraging them to smoke large amounts.  They eventually passed out, and woke up the next morning to find that the Defendant's suitcase, belongings, and car were gone.  Both juveniles will testify that C.C. checked her cell phone and saw that the Defendant had sent her a text message that said "You hoes have been fired."

Upon the advice of Seattle Police Department (SPD) Detective Maurice Washington, C.C. contacted San Jose law enforcement, who responded to the Hotel Elan and placed the juveniles in protective custody, where they were eventually transported back to Seattle.   At some point prior to the arrival of San Jose police, C.C. may have deleted the text from the Defendant.  A subsequent forensic review of C.C.'s phone could not recover the deleted contents of C.C.'s phone.

The next day, approximately forty miles from the Hotel Elan, Oakland Police Department Officer Michael Fox conducted a traffic stop on a silver BMW driven by the Defendant.

**D.     Continued Trafficking of B.M.**

Although B.M. did not accompany the Defendant to California, she continued to talk to him via telephone while he was on the trip.  According to B.M., the Defendant repeatedly complained to her about C.C. and N.C., stating that they were not working hard enough.  The Defendant also told B.M. that he was thinking of leaving the girls in California.  On one occasion, B.M. spoke to C.C., who complained that the Defendant was making her walk the track in uncomfortable clothing and shoes.

GOVERNMENT'S TRIAL BRIEF - 9
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

After leaving California, the Defendant got back in touch with B.M., who was living in Seattle, and asked her to come back to Las Vegas to work for him as a prostitute. B.M. initially resisted, telling him that she was working at Starbucks.  The Defendant continued to contact her, however, and in mid-November, B.M. flew United Airlines to join the Defendant in Las Vegas.  At the Defendant's behest, she conducted prostitution dates in Las Vegas, Arizona, New Mexico, and Utah and provided all of her earnings to the Defendant.  During this time, the Defendant continued to be emotionally and physically abusive to her, and pressured her to engage in commercial sex acts and give him the money she earned.   The government will present hotel records and Backpage.com advertisements to corroborate B.M.'s testimony.

When B.M. returned from one of her out-of-state trips, the Defendant told her that he had recruited another woman, R.B., to work for him as a prostitute.  The Defendant said that he had seen R.B. on the Las Vegas track, approached her, and convinced her to work for him.   In early January, the Defendant told B.M. and R.B. that he wanted to take them to different states to prostitute.  B.M. will testify that the Defendant drove her and R.B. to New Mexico and Colorado, where they posted advertisements on Backpage.com, engaged in commercial sex acts, and gave the money they earned to the Defendant. On January 12, 2015, the Defendant took B.M. and R.B. to Rapid City, South Dakota, where he rented room 132 at a Motel 6.  Prostitution advertisements featuring B.M. and R.B. were posted on Backpage.com's Rapid City board, and each women did at least one date there.

On January 13, 2014, Rapid City Police Department (RCPD) officers prepared to conduct a prostitution sting after seeing B.M.'s advertisement on Backpage.com.   RCPD Detective Kelvin Masur called the number on the advertisement and arranged a prostitution date with B.M.  Officers drove to the Motel 6, where they encountered a man leaving the vicinity of room 132.  Officers interviewed the man, who admitted that he had had consensual sex with a woman in the hotel and provided a "tip."   Soon thereafter,

GOVERNMENT'S TRIAL BRIEF - 10
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

surveillance officers saw the Defendant and R.B. drive through the Motel 6 parking lot. Officers detained the Defendant and R.B. and seized a cell phone and several electronic devices from the vehicle.   Officers then contacted B.M. as she left the hotel room.   B.M. was subsequently interviewed by law enforcement officers and gave a statement consistent with her anticipated testimony at trial.  B.M. told the officers that the Defendant had been physically abusive with her, and showed them bruises on her leg where the Defendant had "stomped" on her after she told him she felt too ill to prostitute.

Law enforcement officers also applied for and received a warrant to search room 132.  Among other things, they found evidence of prostitution activity, as well as two cell phones – a black LG cell phone that the Defendant admitted belonged to him, as well as a ZTE TracFone that B.M. said belonged to her but was often used by the Defendant to communicate with her.  RCPD Detective Kelvin Masur conducted a forensic/digital examination of these phones, as well as a Samsung SGH-T999 belonging to B.M.  Each of these phones contained evidence of the Defendant's involvement in sex trafficking and interstate transportation for the purpose of prostitution.  The government will attempt to introduce some of the text messages retrieved from these phones as statements of a party opponent and/or non-hearsay statements to provide context for the Defendant's statements.

## III.    APPLICABLE LAW

### A.    Transportation of a Juvenile with Intent to Engage in Prostitution

Defendant is charged in Counts One and Two with Transportation of a Minor with Intent to Engage in Criminal Sexual Activity, in violation of Title 18, United States Code, Section 2423(a).   These charges involve C.C. (Count One) and N.C. (Count Two). The elements of Counts One and Two are:

First, that the Defendant transported a person across state lines;

Second, that the Defendant did so with the intent that the person engage in any criminal sexual activity for which any person can be charged with a criminal offense; and

GOVERNMENT'S TRIAL BRIEF - 11
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    <u>Third</u>, that the person was under the age of 18 years at the time.

2    To convict the Defendant of Counts One and Two, the government does not need

3    to prove that the Defendant knew that C.C. and N.C. were, in fact, under the age of 18

4    years at the time that he transported C.C. and N.C. between Washington and California.

5    It is not a defense to the crime of transporting a minor for purposes of prostitution that the

6    Defendant was ignorant of the child's age.  *See United States v. Taylor*, 239 F.3d 994,

7    997 (9th Cir. 2001).  The Ninth Circuit has held that if someone knowingly transports a

8    person for the purposes of prostitution or another sex offense, the transporter assumes the

9    risk that the victim is a minor, regardless of what the victim says or how the victim

10   appears.  *Id.*

11   Numerous other federal appellate courts have similarly held that it is unnecessary

12   to show that the defendant knew the age of the victim to sustain a conviction under

13   § 2423(a).  *See United States v. Tavares*, 705 F.3d 4, 19-20 (1st Cir. 2013); *United States*

14   *v. Griffith,* 284 F.3d 338, 351 (2d Cir. 2002); *United States v. Hamilton*, 456 F.2d 171,

15   173 (3d Cir. 1972); *United States v. Jones*, 471 F.3d 535, 541 (4th Cir. 2006); *United*

16   *States v. Daniels*, 653 F.3d 399, 410, (6th Cir. 2011); *United States v. Cox*, 577 F.3d 833,

17   838 (7th Cir. 2009); *United States v. Scisum*, 32 F.3d 1479, 1485-86 (10th Cir. 1994).

18   Indeed, as the Second Circuit noted in *Griffith*, 284 F.3d at 351, "a defendant is already

19   on notice that he is committing a crime when he transports an individual of any age in

20   interstate commerce for the purpose of prostitution."  Because Section 2423 "is intended

21   to protect young persons who are transported for illicit purposes, and not transporters

22   who remain ignorant of the age of those whom they transport," *see Taylor*, 239 F.3d at

23   996, evidence that a defendant was ignorant as to a victim's true age is legally

24   unavailable as an affirmative defense.

25   This Court has ruled that "any evidence or argument relating to the defendant's

26   knowledge of [C.C. and N.C.'s] ages is irrelevant and inadmissible."  *See* February 10,

27   2016 Order at 11.

28

GOVERNMENT'S TRIAL BRIEF - 12
*United States v. Powell*, CR15-244 RAJ

**B.      Sex Trafficking through Force, Fraud, and Coercion**

Defendant is charged in Count Three with Sex Trafficking of B.M. by Force, Fraud, and Coercion, in violation of Title 18, United States Code, Sections 1, 1591(a)(1) and (b)(1).  The elements of Count Three are as follows:

First, that the Defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained by any means another person, specifically, B.M.;

Second, that the Defendant knew or recklessly disregarded the fact that means of force, threats of force, fraud, coercion, or any combination of such means, would be used to cause B.M. to engage in a commercial sex act; and

Third, that the Defendant's actions were in or affecting interstate commerce.

Section 1591 defines "commercial sex act" to mean "any sex act on account of which anything of value is given to or received by any person."  18 U.S.C. § 1591(e)(3).

The words "force" and "fraud" are not defined by statute, so the jury should be instructed to use the ordinary, everyday definition of these terms.  *See Smith v. United States*, 508 U.S. 233, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning").  "Force" means any form of violence, compulsion or constraint exercised upon another person in any degree.  "Fraud" means any act of deception or misrepresentation.

Section 1591 defines "coercion" to mean "(A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan or pattern intended to cause a person to believe that the failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process."  "Serious harm" is defined by the statute as "any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue

GOVERNMENT'S TRIAL BRIEF - 13
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  performing commercial sexual activity in order to avoid incurring that harm."  18 U.S.C.

2  §§ 1591(e)(2) and (4).

3  In considering whether a defendant used force, fraud or coercion to cause a victim

4  to engage in commercial sex acts, the fact-finder may consider the totality of the

5  defendant's conduct as well as the defendant's knowledge of the victim's special

6  vulnerabilities, including any aspect of the alleged victim's background, station in life,

7  physical and mental condition, experience, education, or socioeconomic status, or any

8  inequalities between the alleged victim and the defendant, which the defendant knew that

9  he could exploit.  *United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) (interpreting the

10  same definition of "serious harm" for the TVPA's Section 1589 forced labor statute,

11  finding that the jury could conclude that the defendant caused the victim to believe that

12  she would suffer reputational harm if she left); *United States v. Nnaji*, 447 Fed. Appx.

13  558, 559 (5th Cir. 2011) ("Serious harm can include psychological coercion").

14  Under Section 1591, the government does not need to link specific acts of force,

15  fraud, or coercion to specific acts of commercial sex.  *See United States v. McIntyre*, 612

16  Fed. Appx. 77 (3d Cir. July 15, 2015) ("Section 1591(a) does not require the direct cause-

17  and-effect connection" between an act of force, fraud, or coercion and an act of

18  commercial sex "that [the defendant] posits."); *United States v. Alvarez*, 601 Fed. Appx.

19  16 (2nd Cir. February 3, 2015) (Section 1591 does not require "but for" causation).

20  Rather, evidence that any victim was threatened with or made to suffer certain

21  consequences, either as direct punishment to her or to serve as an example or warning to

22  other victims, is sufficient to show that the force, fraud, or coercion caused the victims to

23  engage in a commercial sex act.  *See United States v. Alzanki*, 54 F.3d 994, 1002 (1st Cir.

24  1995) (noting that "[t]he climate of fear was enhanced by [the victim's] witnessing one

25  incident involving [her employer's] physical abuse of [his wife], and by learning from

26  [the wife] that [the employer] struck [her] again shortly thereafter"); *United States v.*

27

28

GOVERNMENT'S TRIAL BRIEF - 14
*United States v. Powell*, CR15-244 RAJ

1  *King*, 841 F.2d 1276, 1281 (6th Cir. 1988) (force, threats, and other coercion created
2  "pervasive climate of fear").

3      The statute does not require proof of physical restraint of the victim – such as the
4  use of chains, barbed wire, or locked doors – to establish sex trafficking by force, fraud,
5  or coercion.  18 U.S.C. §1591.  Similarly, the fact that a victim may have had an
6  opportunity to leave is irrelevant if the defendant, using one of the prohibited means
7  discussed earlier for sex trafficking, made a victim reasonably believe she could not
8  leave.  *United States v. Djoumessi*, 538 F.3d 547, 553 (6th Cir. 2008) (rejecting, even
9  under the heightened Section 1584 standard, defendant's argument that the victim
10  "necessarily remained voluntarily at his home because he never physically restrained her
11  . . . and she never attempted to escape" and stating that "opportunities for escape mean
12  nothing if [defendant] gave [the victim] reasons to fear leaving the house").

13      Finally, although a victim may have initially acquiesced to engage in commercial
14  sex acts for a defendant, this does not preclude a finding that the victim was compelled to
15  engage in prostitution thereafter.  For example, if a victim willingly began to engage in
16  prostitution, then wanted to withdraw, but was forced to remain and perform acts of
17  prostitution against her will by force, fraud, or coercion or through threats of serious
18  harm or by a scheme, pattern or plan, intended to cause her to believe that non-
19  performance would result in serious harm to her or another person, then her service
20  became involuntary.  *See United States v. Mussry*, 726 F.2d 1448, 1454 n. 6 (9th Cir.
21  1984) ("Even though a person may come to a job voluntarily, subsequent coerced service
22  constitutes involuntary servitude").

23      In this case, the government intends to introduce evidence that B.M. was caused to
24  engage in commercial sex acts through force, fraud, and coercion.  Specifically, the
25  government will argue that Defendant's repeated acts of physical violence towards B.M.
26  – beginning when he slapped her on her first evening in Las Vegas and continuing until
27  when he "stomped" on her legs when she did not want to engage in commercial sex acts

28

GOVERNMENT'S TRIAL BRIEF - 15
*United States v. Powell*, CR15-244 RAJ

1  during their final cross country trip – established a "climate of fear" and caused her to

2  believe that Defendant was capable of seriously harming her if she did not do what he

3  wanted or follow his instructions.

4       B.M. will also testify that although she may have initially agreed to come to Las

5  Vegas to work for the Defendant as a prostitute, there were many times when she

6  expressed her desire to not engage in commercial sex acts.  The Defendant did not give

7  her a choice as to whether she would engage in commercial sex; instead, when she told

8  him that she didn't feel like working, he would be physically and emotionally abusive

9  toward her and tell her that she had to go earn money for him.  B.M. will testify that on

10  many occasions, she agreed to engage in prostitution acts because she was afraid of

11  angering the Defendant if she did not do what he wanted.  Furthermore, it was her belief,

12  based upon Defendant's false promises after her first trip to Las Vegas that would not hit

13  her again and would treat her respectfully, that Defendant would take care of her if she

14  worked for him as a prostitute.  The government submits that these facts are sufficient to

15  establish that Defendant caused B.M. to engage in commercial sex acts through force,

16  fraud, and coercion.

17  **C.  Interstate Transportation for the Purpose of Prostitution**

18       The Defendant also is charged in Count Four with Persuading and Inducing Travel

19  of an Individual (B.M.) for the Purpose of Prostitution through Coercion and Enticement

20  in violation of Title 18, United States Code, Section 2422(a).  In order for the Defendant

21  to be found guilty of Count Four, the government must prove beyond a reasonable doubt

22  that the Defendant knowingly persuaded, induced, enticed, or coerced B.M. to travel in

23  interstate commerce to engage in prostitution, or attempted to do so.  The terms

24  "persuade," "induce," and "entice" have their ordinary meaning.  It is not a defense to

25  Counts One, Two, or Four that a person consented to travel for prostitution.  *See Gebardi*

26  *v. United States*, 287 U.S. 112, 119 (1932) ("the statute is drawn to include those cases in

27  which the woman consents to her own transportation");  *United States v. Phillips*, 640

28

GOVERNMENT'S TRIAL BRIEF - 16
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

F.2d 87, 96 (7th Cir. 1981) ("the consent of the woman involved is no defense to a Mann Act charge, but it would be a defense to kidnapping").  The defendant need not create out of whole cloth the woman's desire to travel for prostitution.  *United States v. Rashkovski*, 301 F.3d 1133, 1136-37 (9th Cir. 2002).

**D.     In or Affecting Interstate Commerce**

The United States must only establish that the crime of sex trafficking was in, or affected interstate commerce, and does not need to prove that the Defendant knew his actions were in or affecting interstate commerce.  *United States v. Anderson*, 560 F.3d 275, 279 (5th Cir. 2009) ("We have held in a variety of contexts, that no *mens rea* attaches to the interstate nexus element . . . It is not necessary for the Government to show that the defendant actually intended or anticipated that commerce was actually affected").

Commercial sex acts are inherently commercial, as they involve the exchange of money or other items of value in commerce.  Moreover, courts have upheld the application of Section 1591 to intrastate activity where the crime affected interstate commerce through the use of hotels, phones, advertisement websites, and condoms imported from outside the state.  The Ninth Circuit recently affirmed, in a trafficking case arising out of this district, that "any individual instance of conduct regulated by the [Trafficking Victims Protection Act, which encompasses Section 1591] need only have a *de minimus* effect on interstate commerce" and affirmed Judge Bryan's instruction to the jury that "any act that crosses state lines is 'in' interstate commerce" and "an act or transaction that is economic in nature" and "affects the flow of money in the stream of commerce *to any degree* 'affects' interstate commerce."  *United States v. Walls*, 784 F.3d 543, 548-59 (9th Cir. 2015).  *See also United States v. Evans*, 476 F.3d 1176 (11th Cir. 2007) (upholding application of Section 1591 to intrastate conduct that affected interstate commerce); *United States v. Todd*, 627 F.3d 329, 330 (9th Cir. 2010) (advertising across

GOVERNMENT'S TRIAL BRIEF - 17
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

state lines).  The crime of sex trafficking is inherently commercial, and as a commercial activity it affects interstate commerce.

Acts and transactions which cross state lines are "in" interstate commerce, whether or not they are commercial in nature.  *See, e.g., Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 255-56 (1964).  Acts and transactions that are economic in nature and affect the flow of money in the stream of commerce to any degree, however minimal, "affect" interstate commerce.  *Gonzalez v. Raisch*, 545 U.S. 1, 17 (2005).  Significantly, the government need not prove both that the Defendant's actions were in ***and*** affecting interstate commerce.  The use of the phrase "in or affecting interstate or foreign commerce" makes it clear that federal jurisdiction attaches even if there is only proof that the defendant's actions affected interstate commerce.

Here, the evidence at trial will show that at various times in 2014 and 2015, the Defendant caused B.M. to be transported across state lines from Washington to Nevada, and then on to numerous other states, where she engaged in commercial sex acts.  Similarly, the evidence will show that the Defendant transported C.C. and N.C. to California with the intent that they engage in commercial sex acts.  These instances of interstate travel, on their own, are sufficient to meet the "interstate commerce" element of the charges here.  Furthermore, the Defendant intended to and did cause numerous online prostitution advertisements featuring B.M. to be posted on the website Backpage.com.  The government will present evidence that none of the servers for this website are located in the state of Washington.  Thus, when advertisements are placed on Backpage.com by an individual in Washington, they are routed to the server in another state.  Similarly, when an individual accesses Backpage.com, the information is transmitted from the server to the location where the individual is situated.

Further, the evidence will show that the Defendant and B.M. used cellular telephones to communicate with each other and prospective "dates" regarding commercial sex.  The courts have repeatedly held that the phone system and use of the

GOVERNMENT'S TRIAL BRIEF - 18
*United States v. Powell*, CR15-244 RAJ

computer is an instrumentality of interstate and foreign commerce; as such, their use affects interstate or foreign commerce.  *See, e.g., United States v. Pipkins*, 378 F.3d 1281, 1295 (11th Cir. 2004) (use of pagers, phones, and cell phones affects interstate commerce); *United States v. Clayton*, 108 F.3d 1117, 1117 (9th Cir. 1997) (telephones are instrumentalities of interstate commerce); *United States v. Sutcliffe*, 503 F.3d 944, 953 (9th Cir. 2007) (the internet is an instrumentality and channel of interstate commerce).

Finally, intrastate conduct at hotels that serve customers from other states also has an effect on interstate commerce.  *Heart of Atlanta Motel, Inc.*, 379 U.S. at 258.  Here, the Defendant and B.M. stayed at hotels in various cities and states while they were preparing for and posting online advertisements, and also used the hotels to engage in sex with prostitution clients.  These facts are also sufficient to establish that the Defendant's actions were in and affected interstate commerce.

## IV.   LEGAL AND EVIDENTIARY ISSUES

### A.   Statements of Defendant

The government intends to introduce evidence regarding numerous statements, both oral and written, that the Defendant made to other individuals.  These statements include the recorded statement Defendant made to South Dakota law enforcement officers Brent Gromer and Kelvin Masur,[5] as well as statements that the Defendant made to an undercover Los Angeles Police Department detective in July 2007.  The government also intends to introduce evidence of verbal statements the Defendant made to other witnesses, as well jail calls made by the Defendant, text messages sent by the Defendant, and emails written by the Defendant.  The government anticipates referencing these statements during its opening and admitting evidence of the statements during its case-in-chief.

---

[5] This Court has previously held that the Defendant's statements to the South Dakota law enforcement officers were voluntarily made and has denied the defense's motion to suppress those statements.  *See* Docket No. 123.

GOVERNMENT'S TRIAL BRIEF - 19
*United States v. Powell*, CR15-244 RAJ

1      All of these statements are admissible pursuant to Fed. R. Evid. 801(d)(2), which

2   provides that a defendant's own statements are admissible, non-hearsay admissions of a

3   party-opponent when offered into evidence by the United States.  *See* Fed. R. Evid.

4   801(d)(2)(A).  The government may offer all, some, or none of a defendant's statements

5   at trial under Rule 801(d)(2).  A defendant, however, cannot use this rule to offer his own

6   prior out-of-court statements.  Such statements are inadmissible hearsay because the

7   Defendant is the proponent and thus the statements are not offered against him.  *United*

8   *States v. Mitchell*, 502 F.3d 931, 964-65 (9th Cir. 2007); *United States v. Ortega*, 203

9   F.3d 675, 682 (9th Cir. 2000); *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir.

10   1988).   If the Defendant wants to tell his side of the story, he must take the stand and

11   testify under oath and be subject to cross-examination.  Indeed, even where the

12   government elicits an inculpatory portion of a defendant's statement from a witness, the

13   defendant is not entitled to elicit the exculpatory portion on cross-examination.  *Ortega*,

14   203 F.3d at 682.

15      Moreover, the rule of completeness has no place in the analysis of the Defendant's

16   unrecorded and unwritten statements.  *Id.*  With respect to the Defendant's recorded

17   statements, the rule of completeness is not violated so long as the "complete statement

18   [does] not serve to correct a misleading impression in the edited statement that is created

19   by taking something out of context."  *United States v. Vallejos*, 742 F.3d 902, 905 (9th

20   Cir. 2014) (quotations omitted).  Here, the government's proposed clips do not create a

21   misleading impression and so the rule of completeness does not apply.

22   **B.    Statements Offered for a Non-Hearsay Purpose**

23      A statement is hearsay if it is (1) an assertion that (2) is made out of court and (3)

24   is offered to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c).  Many out

25   of court statements are not hearsay because they either are not assertions, or they are not

26   offered to prove the truth of the matter asserted.  *United States v. Oguns*, 921 F.2d 442,

27   449 (2nd Cir. 1990) (questions are not assertions and are thus not hearsay).  Furthermore,

28

GOVERNMENT'S TRIAL BRIEF - 20
*United States v. Powell*, CR15-244 RAJ

many statements that meet the definition of hearsay are admissible under one or more of the many exceptions to the hearsay rule.

In this case, the government may offer out of court statements not to prove the truth of the matters asserted, but either to provide context for the Defendant's statements or to explain the subsequent actions of the law enforcement agents or witnesses. These statements do not constitute "hearsay" within the definition of Rule 801. *United States v. Catano*, 65 F.3d 219, 225 (1st Cir. 1995) (informant's part of conversation with agent was not hearsay, because it was offered for context and not to prove the truth of the informant's statements); *United States v. Lowe*, 767 F.2d 1052, 1063-64 (4th Cir. 1985) (agent's testimony regarding information he received from third party was not hearsay, since it was offered to explain the preparations agents took in anticipation of the accused's arrest).

Specifically, the government intends to introduce a number of text messages sent between the Defendant's black LG-LS740 cell phone and other individuals, as well as text messages between the Defendant and B.M. that were recovered from B.M.'s Samsung Galaxy S III cell phone and a ZTE cell phone that was shared by the Defendant and B.M. The text messages sent to the Defendant by other individuals are not hearsay, because they are not offered for their truth, but rather to provide context for the Defendant's responses.

Similarly, law enforcement agents who investigated the case may testify about statements made to them by the victims or other witnesses during the course of the investigation. These statements will not be introduced for their truth, but rather to explain why the investigating agents took subsequent action.

**C.   Evidence Regarding the Victims' Prior Involvement in Prostitution**

Pursuant to Federal Rule of Evidence 412, this Court has ordered that the defense is prohibited at trial from (1) introducing evidence that C.C., N.C., or B.M. engaged in commercial sex acts before or after leaving the Defendant; (2) questioning any of these

GOVERNMENT'S TRIAL BRIEF - 21
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  women about their prior or subsequent and unrelated prostitution activity; and (3)

2  otherwise referencing such inadmissible evidence during *voir dire*, opening statements,

3  and closing arguments. *See* Docket No. 111 at 17.  As noted above, in order to provide

4  the jury with a full understanding of the means by which the Defendant recruited his

5  victims, it is the government's intention to elicit very limited and circumscribed

6  testimony from B.M. and C.C. regarding their prior involvement in prostitution.

7  Specifically, the government intends to elicit the following information.

8          First, B.M. will testify that she met the Defendant in early 2014 after he texted the

9  number she had listed on a prostitution advertisement she had posted on Backpage.com.

10  This fact is necessary in order to explain how the Defendant, who was living in Las

11  Vegas, came into contact with B.M., who was living in Seattle.  It is also relevant

12  because it demonstrates that the Defendant knew B.M. was a prostitute and was

13  attempting to recruit her to work for him.  Finally, the Defendant's actions are consistent

14  with the *modus operandi* he employed with C.C. and the LAPD undercover officer in

15  2007.  The government does not intend to introduce any Backpage.com advertisements

16  from this time frame, nor does it intend to elicit any other details about B.M.'s

17  involvement in prostitution before she met the Defendant.

18          Second, C.C. will testify that the Defendant approached her on August 21, 2014,

19  when she was walking the prostitution track on Aurora Avenue.  She will also testify that

20  the Defendant told her at this time that he knew she was a prostitute, because he had seen

21  her Backpage.com advertisement next to his "female's" advertisement.  These facts are

22  direct evidence of the Defendant's intent in transporting C.C. and N.C. to California –

23  namely, that the Defendant knew that C.C. was a prostitute because of her Backpage.com

24  advertisement; he targeted her because he knew she was a prostitute; and he drove to

25  California with C.C. and N.C. intending to have both of them work for him there as

26  prostitutes.  This evidence will also corroborate B.M.'s testimony that the Defendant had

27  told her that he was going to recruit a new prostitute through Backpage.com.

28

GOVERNMENT'S TRIAL BRIEF - 22
*United States v. Powell*, CR15-244 RAJ

1    Finally, C.C. will testify that after meeting the Defendant on August 21, 2014, she

2    engaged in several prostitution dates that evening at the Studio 6 motel in Mountlake

3    Terrace and provided her earnings to the Defendant.  C.C. will further testify that at least

4    one of these dates was with one of her "regular" customers and was not arranged through

5    Backpage.com.  The government submits that this evidence is necessary to rebut the

6    defense's anticipated argument that C.C. could not have earned any money for the

7    Defendant on August 21 because Backpage.com records do not show that any

8    advertisements featuring C.C. or N.C. were posted on Backpage.com that day.

9    The government does not intend to elicit any other evidence regarding C.C. or

10   N.C.'s involvement in prostitution before or after their time with the Defendant.  The

11   government respectfully submits that the above-listed evidence does not fall within the

12   boundary prohibitions of Rule 412 because it is "intrinsic" to the crimes charged in the

13   Superseding Indictment.  *See* Advisory Notes to Fed. R. Evid. 412.  As set forth above,

14   this evidence is directly relevant to the charges against the Defendant because it

15   establishes his method of recruitment and his intent toward the victims.  Because the

16   probative value of this limited evidence "significantly outweighs possible harm to the

17   victim" it is admissible under Rule 412.  Moreover, admission of these limited facts will

18   not in any way open the door for the defense to elicit more detailed evidence regarding

19   the victims' prior and subsequent involvement in prostitution that does not involve the

20   Defendant; such evidence would only be offered to prove that the victims engaged in

21   other sexual behavior or their sexual predisposition, both of which are prohibited by

22   Rule 412.

23   **D.    Clarification Regarding the Court's Order Regarding Backpage.com**
24        **Advertisements**

25        In its February 10, 2016 omnibus Order regarding the parties' motion *in limine*,

26   the Court addressed the defense's motion to introduce evidence regarding statements that

27   C.C. and N.C. had made about their ages in Backpage.com advertisements.  The Court

28

GOVERNMENT'S TRIAL BRIEF - 23
*United States v. Powell*, CR15-244 RAJ

1   held that the defense is permitted to question C.C. and N.C. "regarding false statements

2   they made about their ages on Backpage.com, but only statements made during the

3   specific time periods reflected in the Superseding Indictment." *See* Docket No. 111 at

4   11.  The Court further held that the defense is not permitted to examine the witnesses

5   about any Backpage.com postings by these witnesses "outside of the charging period

6   because to do so would constitute evidence regarding 'other sexual behavior," and that is

7   prohibited under Rule 412.

8         The government notes that although the Superseding Indictment charges the

9   Defendant with transportation of C.C. and N.C. to California for the purpose of

10  prostitution "in August 2014," the evidence at trial will establish that C.C. and N.C.'s

11  involvement with the Defendant spanned only four days – from August 21, 2014 (the day

12  that the Defendant approached C.C. on Aurora Avenue) to August 25, 2014 (the day he

13  left them stranded in the San Jose hotel).  The government is not aware of any

14  Backpage.com advertisements of C.C. or N.C. that were posted during this time frame.

15  Because there are no Backpage.com advertisements featuring C.C. or N.C. that were

16  posted during the four day period they were with the Defendant, the government

17  respectfully submits that the defense should not be able to cross-examine or otherwise

18  question C.C. or N.C. about any advertisements that were posted on another date in

19  August 2014, as such advertisements would be entirely unrelated to the Defendant.[6]

20  Similarly, the defense should not be able to cross-examine or otherwise question B.M.

21  about any advertisements that were posted during the time periods that she was not

22  working for the Defendant.

23

24

25

---

26  [6] In line with this understanding, the Government has redacted portions of Government's Exhibit 90, which is a
    cellular telephone analysis of victim C.C.'s phone.  Specifically, the Government redacted a column titled "Visits"

27  from C.C.'s web history during August 21-25, 2014.  This column represents the number of times a visitor has
    frequented the listed web page and would indicate to the jury that C.C. had been to certain websites (*i.e.*,

28  Backpage.com) on multiple prior occasions.  The Government's position is that this evidence violates Rule 412.

GOVERNMENT'S TRIAL BRIEF - 24
*United States v. Powell*, CR15-244 RAJ

**E.      Text Messages Sent by C.C. Regarding California Trip**

This Court has granted the government's motion *in limine* to exclude any evidence of consent relating to C.C. and N.C., on the grounds that lack of consent is not an element of Counts One and Two.  The government anticipates that the defense may attempt to introduce or cross-examine C.C. about text messages she exchanged with someone identified in her contact list as "Royalboss206 RoyalP," between and August 23 and August 24, 2014, in which she stated that she was "driveeinngg Teew Calii," was doing "GuuddGuudd," and "Gettinngg Diss $$$$ in Calii Real Quickk."  The government submits that the defense should be precluded from introducing or questioning C.C. about these text messages, as their only possible relevance would be to suggest to the jury that C.C. consented to travel to California.

**F.     Expert Witnesses**

      **1.      Sacramento Police Department Detective Derek Stigerts**

The United States is prepared to call Sacramento Police Department Detective Derek Stigerts as an expert pursuant to Federal Rule of Evidence 702.  Under FRE 702, a witness qualified as an expert based upon his knowledge, skill, experience, training, or education may testify on his opinion provided that it will "help the trier of fact to understand the evidence or to determine a fact in issue."  The proffered testimony must be both (1) relevant, that is, it must have a valid connection to the pertinent inquiry at trial, and (2) reliable, that is, it must be trustworthy.  *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 597 (1993).

The government will call Detective Stigert to testify as an expert witness about the pimp/prostitute relationship; the general *modus operandi* of pimps, and the subculture of pimps and interstate prostitution.   The subject matter of Detective Stigerts' testimony, as well his expert qualifications, have been briefed by the parties and were the subject of a gatekeeping hearing on February 11, 2016.  *See* Docket Nos. 62, 77, 126, 129, and 130.  After this hearing, the Court ruled that Detective Stigerts possessed the necessary

GOVERNMENT'S TRIAL BRIEF - 25
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

expertise on the pimp/prostitute subculture, and would be permitted to provide testimony regarding this subculture and the relationship between pimp and prostitute.  On March 25, 2016, this Court issued a written Order regarding the scope of Detective Stigerts' testimony.  *See* Docket No. 134.  The government has provided Detective Stigerts with a copy of the Court's Order and will ensure that his testimony complies.

### 2. Seattle Police Department Detective Tim Luckie and Rapid City Police Department Detective Kelvin Masur

The government will also call two law enforcement officers to testify about their analysis of various cell phones seized during the course of this investigation. Specifically, the government will call Seattle Police Department Detective Timothy Luckie to testify about his analysis of a cellular telephone belonging to C.C. and seized by law enforcement in California.  The government will also call Rapid City Police Department Detective Kelvin Masur to testify about his analysis of various cell phones belonging to the Defendant and B.M. that were seized by law enforcement on January 13, 2015.

The government submits that the anticipated testimony of Detectives Luckie and Masur regarding their analyses of various cell phones during this investigation is not "expert" testimony because it is either summary testimony, or is rationally based on the witness's perception.  *See* FRE 701(a).  In an abundance of caution, the government nevertheless has provided notice to defense counsel of each witness's anticipated testimony.   Specifically, Detective Luckie will testify about his forensic collection of data from C.C.'s cell phone and Detective Masur will testify about his analysis of three cell phones (a Samsung Galaxy S III belonging to B.M.; a black LG-LS740 cell phone belonging to the Defendant; and a ZTE cell phone shared by the Defendant and B.M.). Each witness will testify generally about the technology and procedures for collecting digital media.  Each witness will also testify generally about how the forensic data collection was performed in this case, including what tools were used, what data was

1    extracted, and the results of each witness's collection and analysis.  With respect to the

2    analysis of C.C.'s cell phone, Detective Luckie will testify that he could not locate

3    Cellebrite software specific to C.C.'s make and model of phone and accordingly used a

4    generic android model to conduct the download from C.C.'s phone.

5    **G.    Inextricably Intertwined Evidence**

6        As set forth in a February 3, 2016 notice to the defense, the government intends to

7    introduce evidence of the Defendant's uncharged conduct toward other women that is

8    inextricably intertwined with the charges in this case.  Specifically, the government

9    intends to introduce evidence regarding the Defendant's recruitment and interstate

10   transportation of R.B., whom the Defendant transported along with B.M., during the time

11   frame charged in Count Three.  The government also intends to introduce evidence that

12   during this same time frame, the Defendant sent text messages to other women

13   attempting to convince them to work for him as prostitutes, and to B.M., instructing her

14   on how to convince other women to work for the Defendant as prostitutes.

15       Evidence of "other acts" is not subject to Rule 404(b) analysis if it is

16   "'inextricably intertwined' with the charged offense."  *United States v. Beckman*, 298

17   F.3d 788, 793-94 (9th Cir. 2002).   This exception may be triggered in one of two ways.

18   First, it applies when other acts "evidence . . . constitutes a part of the transaction that

19   serves as the basis for the criminal charge."  *United States v. Vizcarra-Martin*, 66 F.3d

20   1006, 1012 (9th Cir. 1995).   Thus, in *United States v. Williams*, 989 F.2d 1061, 1070

21   (9th Cir. 1993), the Ninth Circuit "concluded contemporaneous sales of cocaine and

22   crank by the defendant were inextricably intertwined with the crime for which the

23   defendant was charged:  the sale of cocaine."  *Vizcarra-Martinez*, 66 F.3d at 1012.  As

24   noted in *Williams*, the policies underlying Rule 404(b) are inapplicable when offenses

25   committed as part of a "'single criminal episode' become other acts simply because the

26   defendant 'is indicted for less than all of his actions.'"  *Id.*  Second, the exception applies

27   when "other act" evidence is necessary to permit the prosecutor to offer a coherent and

28

GOVERNMENT'S TRIAL BRIEF - 27
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

comprehensible story regarding the commission of the crime.  *Williams*, 989 F.2d at 1070.

The evidence regarding the Defendant's recruitment and transportation of R.B. both "constitutes a part of the transaction that serves as the basis for the criminal charge" and is necessary to permit the government to offer a coherent and comprehensible story regarding the commission of the crime.  Specifically, B.M. will testify that while she was in New Mexico in December 2015 at the Defendant's instruction working as a prostitute, the Defendant told her that he had recruited R.B. off the track in Las Vegas.  B.M. will testify that the Defendant subsequently took her and R.B. to New Mexico, Colorado, and South Dakota to work for him as prostitutes and that she witnessed the Defendant yelling at R.B. on several occasions.  Indeed, the South Dakota law enforcement officers will testify that the Defendant was driving in a car with R.B. when he was first encountered by law enforcement on January 13, 2015.

The government will also seek to introduce texts messages sent between the Defendant and an unknown individual on January 11, 2013 (two days before the Defendant's arrest) regarding the two "ho's" who were working for him – B.M. and R.B. The Defendant makes additional references to R.B. in these text messages, complaining that "this new bitch is exPensive" and "doesn't understand the concePt of hard work and stacking uP doah."   This evidence of the Defendant's conduct with regard to R.B. should be admitted, since it is inextricably intertwined with the charged offenses and constitutes a part of the transaction that serves as the basis for the criminal charge.  This evidence is also necessary in order to permit the government to tell the full story regarding the Defendant's sex trafficking of B.M. in December 2014 and January 2015, and is direct evidence of the charged offense.

Similarly, the government will seek to introduce text messages demonstrating that only two days before his arrest, the Defendant was attempting to recruit other women to work for him.  This evidence is inextricably intertwined with the charged offenses, as it

GOVERNMENT'S TRIAL BRIEF - 28
*United States v. Powell*, CR15-244 RAJ

1   occurred at the same time that Powell is alleged to have trafficked B.M. and at times

2   involved the Defendant's using B.M. to recruit on his behalf.  Further, the text messages

3   demonstrate the Defendant's involvement in the prostitution and sex trafficking trade,

4   and evince his intent to convince women to engage in commercial sex acts and provide

5   him with their earnings.

6   **H.   Prior Consistent Statements of B.M. and C.C.**

7   On February 27, 2014, B.M. contacted her mother from Harrah's Hotel in Las

8   Vegas.  B.M. told her that she had just flown out to Las Vegas to work as a prostitute for

9   the Defendant, and that the Defendant had hit her and that she needed help.  B.M.'s

10   mother advised her to contact hotel security and ask for help.  When B.M. did so, she was

11   arrested on an unrelated outstanding warrant.  B.M. also told Las Vegas Metropolitan

12   Police Department Officer Edgardo Lovino that she was in Las Vegas working as a

13   prostitute for the Defendant, and that the Defendant had slapped her earlier that evening.

14   B.M. told Officer Lovino that the Defendant slapped her in the face for saying something

15   dumb and told B.M. that he would kill her if she ever disrespected him again.  B.M.

16   further reported that she feared for her life.

17   In August 2014, B.M. contacted her mother and told her that she wanted to leave

18   the Defendant and come home.  Her mother agreed to pick her up and take her home.

19   Later that day, B.M. told her mother that the Defendant was abusive to her, had hit her

20   and thrown objects at her, and had thrown food or plates of food at her.  These statements

21   are all consistent with what B.M. subsequently told law enforcement and what she will

22   testify to at trial.

23   Similarly, while she was in California with the Defendant and immediately after

24   he left, C.C. made statements to B.M. and SPD Detective Maurice Washington regarding

25   the Defendant and his attempts to have her work for him as a prostitute in California.

26   Specifically, C.C. told Detective Washington that the Defendant had taken her and N.C.

27   to California and was now forcing them to walk the "ho stroll" (a slang term for

28

prostitution track) in San Jose.  C.C. further stated that the Defendant was making her wear uncomfortable high heels and revealing clothes.  During a phone conversation, C.C. also told B.M. that the Defendant was forcing her to wear uncomfortable shoes.

The government is aware, based upon pleadings filed in this case, that the defense intends to impugn the victims' credibility at trial and to argue that they are falsely accusing the Defendant of trafficking and/or interstate transportation for the purpose of prostitution in order to avoid prosecution on prostitution charges.  If the defense pursues this strategy at trial, both B.M.'s prior consistent statements to her mother and Officer Lovino and C.C.'s prior consistent statements to Detective Washington and B.M. should be admitted as prior consistent statements under Federal Rule of Evidence 801(d)(1)(B).

Rule 801(d)(1)(B) permits the introduction of a declarant's consistent out-of-court statement where the "declarant testifies and is subject to cross-examination about a prior statement, and the statement is . . . (B) consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying . . ."  "The Rule permits the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive."  *Tome v. United States*, 513 U.S. 150, 167 (1995).  The statement can be introduced through a witness other than the declarant.  *United States v. Green*, 258 F.3d 683, 692 (7th Cir. 2001). Furthermore, the Advisory Committee Notes for the 1972 Proposed Rules, *Note to Subdivision (d)* explains that "[p]rior consistent statements traditionally have been admissible to rebut charges of recent fabrication or improper influence or motive but not as substantive evidence.  Under the rule they are substantive evidence.  The prior statement is consistent with the testimony given on the stand, and, if the opposite party wishes to open the door for its admission in evidence, no sound reason is apparent why it should not be received generally."

GOVERNMENT'S TRIAL BRIEF - 30
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The various prior consistent statements made by B.M. to her mother and Officer Lovino, which were made prior to the rise of any motivation by B.M. to avoid prostitution charges in South Dakota or elsewhere, as well as the prior consistent statements of C.C., are not hearsay and are admissible under Rule 801(d)(1)(B). Furthermore, the probative value of these prior consistent statements outweighs any danger of unfair prejudice under Federal Rule of Evidence 403.  In *United States v. Payne*, 944 F.2d 1458, 1471 (9th Cir.1991), the Ninth Circuit held that prior consistent statements had "significant probative force bearing on credibility apart from mere repetition" because the statements "demonstrated that [the witness] had repeated certain aspects of her story . . . " *See also United States v. Miller*, 874 F.2d 1255, 1274 (9th Cir.1989) (observing that the determination that "the prior consistent statement has significant probative force bearing on credibility apart from mere repetition . . . rests in the trial judge's sound discretion") (citation, footnote reference, and internal quotation marks omitted); *United States v. Chang Da Liu*, 538 F.3d 1078, 1086 (9th Cir. 2008) (agent's testimony about victim's statements made prior to receiving any assistance from the FBI were properly admitted under 803(d)(1)(B)).

Assuming that the defense attacks the credibility of B.M. and C.C. and argues, at trial, that they were improperly influenced or motivated to accuse the Defendant of abusing her and trafficking her in order to avoid prosecution, then Rule 801(d)(1)(B) provides a sound legal basis for the government to introduce prior consistent statements made by B.M. and C.C. in order to rebut this claim of recent fabrication or improper influence and motive.

## I.     Defendant's Communications from the FDC

The Defendant has been detained at the Federal Detention Center in SeaTac since his transfer to this district in July 2014.  During his pre-trial detention, the Defendant has made telephone calls and sent numerous emails directly to B.M.  Per FDC policy, these telephone calls were recorded and the emails were retained.  The recordings and emails

GOVERNMENT'S TRIAL BRIEF - 31
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  were provided to the government by the FDC and were subsequently produced to the

2  defense in discovery.

3        The government anticipates introducing a portion of these calls and emails, as

4  their content is directly relevant to the Defendant's sex trafficking of B.M.  Specifically,

5  in a number of these emails and calls, the Defendant attempts to discuss his case with

6  B.M.  Among other things, he asks her to write a letter to the Court and to talk to his

7  lawyer, and also showers her with compliments and tells her that he loves her and wants

8  to have sex with her.  The government submits that these communications are evidence

9  of the Defendant's attempts to manipulate B.M. into recanting her prior statements

10  through his false professions of love and attempts to make her feel guilty for the term of

11  incarceration he is facing.  B.M. will testify about these calls and emails, and will identify

12  her voice and the voice of the Defendant.  B.M. will also testify that the Defendant's

13  statements follow the pattern he previously used to compel her to engage in commercial

14  sex acts – namely, falsely claiming to love and care for her and using her romantic

15  feelings for him to manipulate her into earning money for him.

16        The government also intends to question B.M. about various statements that she

17  made to the Defendant in these emails and phone calls.  These include statements by

18  B.M. that she loves and misses the Defendant and the good times they had together, as

19  well as statements that she is willing to talk to the Defendant's attorney and write a

20  "letter" on his behalf.  The government will also ask B.M. about statements she made

21  suggesting that it was not "fair" that Defendant was facing a significant term of

22  incarceration.  It is the government's understanding that B.M. will testify that she did and

23  still does have complicated feelings for the Defendant.  She will also testify that she

24  never intended to assist the Defendant's defense, but simply told him what she thought he

25  wanted to hear so that he would not harass or threaten her.

26        It is the government's understanding, based upon conversations with defense

27  counsel, that the defense will stipulate to the authenticity of the FDC calls and emails.

28

GOVERNMENT'S TRIAL BRIEF - 32
*United States v. Powell*, CR15-244 RAJ

1  The government also anticipates that the defense will seek to introduce portions of these
2  FDC communications either during cross-examination or in its case-in-chief.  As noted
3  above, any statements made by the Defendant or B.M. in these calls, if elicited by the
4  defense for their truth, are inadmissible hearsay.

5  **J.    Evidence Regarding B.M.'s Pregnancy**

6          This Court has previously ruled that the government cannot elicit evidence at trial
7  regarding B.M.'s abortion, or the fact that the Defendant pressured her to get an abortion
8  so that she could continue earning money for him through prostitution, on the grounds
9  that "there is a significant risk such evidence would appeal to the pro-life component of
10 the jury venire to the degree and extent it could cause them to base their decision on
11 something other than the precise charges, and convict the defendant because he was the
12 perceived motivating force in the termination of B.M.'s pregnancy." *See* Docket No. 111
13 at 6.  The government understands and will comply with the Court's order.

14         The government submits, however, that it should be permitted to elicit from B.M.
15 that she became pregnant with the Defendant's child in the summer of 2014.   The
16 government anticipates that the defense strategy at trial will be to impugn B.M.'s
17 credibility and argue that, among other things, the fact that B.M. returned to the
18 Defendant on several occasions, and made loving statements to him in emails and on
19 phone calls as recently as October 2015, demonstrates that he did not in fact use force,
20 fraud, or coercion to compel her to engage in commercial sex acts.  B.M. has previously
21 made statements to law enforcement and under oath that her pregnancy caused her to
22 develop a strong emotional connection with the Defendant, as well as a desire to one day
23 have a family with him.  She further stated that her feelings for the Defendant were
24 intensified by the pregnancy and were part of why she returned to him in the fall of 2014.

25         In order to provide the jury with the full context of why B.M. returned to the
26 Defendant on numerous occasions, it is crucial that B.M. be permitted to explain how her
27 pregnancy increased her feelings of love and loyalty to the Defendant, and made it more

28

GOVERNMENT'S TRIAL BRIEF - 33
*United States v. Powell*, CR15-244 RAJ

1   difficult for her to break off contact with him.  This evidence will assist the jury in

2   understanding why B.M. agreed to return to the Defendant in November 2015, and why

3   she continues to have conflicted feelings of loyalty and love toward the Defendant.  If

4   B.M. is not able to explain precisely why she returned to the Defendant, there is a real

5   risk that the jury may reach an erroneous conclusion – namely, that B.M. herself chose to

6   work for the Defendant as a prostitute.

7           It is important to note that the government can question B.M. about her pregnancy

8   without eliciting that she had an abortion, or that the Defendant pressured her to have an

9   abortion.  B.M. can simply state that although she became pregnant by the Defendant, she

10  did not deliver a child.   Because the evidence that B.M. was pregnant by the Defendant

11  has significant probative value, but would have little to no prejudicial impact, the

12  government respectfully submits that it should be permitted to question B.M. about this

13  topic on direct examination.

14  ## K.     Audio Recordings

15          As discussed above, the government intends to introduce a portion of the audio

16  recording of the January 13, 2015 interview of the Defendant by Special Agent Gromer

17  and Detective Masur.  The government also intends to introduce a portion of the audio

18  recordings of several July 2007 conversations between the Defendant and LAPD

19  undercover detective Kristin Koseklin (now Kristin Humphries) that are the subject of the

20  Defendant's 2007 pandering conviction.  This Court has previously ruled that evidence

21  regarding the Defendant's 2007 conviction is admissible.  *See* Docket No. 111 at 3.

22  Finally, the government may seek to introduce a portion of the Defendant's recorded calls

23  from the FDC.

24           Audio recordings are admissible where the proponent establishes by clear and

25  convincing evidence their authenticity, accuracy, and trustworthiness.  *United States v.*

26  *King*, 587 F.2d 956, 961 (9th Cir. 1978).  The authenticity of recordings is a jury

27  question, once a prima facie case of authorship is made out by the proponent of the

28

GOVERNMENT'S TRIAL BRIEF - 34
*United States v. Powell*, CR15-244 RAJ

1  evidence.  *Carbo v. United States*, 314 F.2d 718, 742 43 (9th Cir. 1963).  A prima facie

2  case of authorship may be shown circumstantially.  *United States v. Young*, 470 F.2d 962,

3  969 (9th Cir. 1972).

4       For example, authenticity may be made by voice identification, *see* Wigmore,

5  Evidence §2155; or by the actual substance of the communication.  *Dege v. United*

6  *States*, 308 F.2d 534, 536 (9th Cir. 1962).  Thus, the Ninth Circuit has permitted voice

7  identification by law enforcement officers who had either "talked to appellants on the

8  telephone at the time of the taping, had worked on the intercepts at the time they were

9  made, or had spoken many times to one or more of the appellants."  *United States v.*

10  *Turner*, 528 F.2d 143, 163 (9th Cir. 1975).  The Court is not required to listen to the tapes

11  before permitting them to be played to the jury.  *United States v. Tisor*, 96 F.3d 370, 376-

12  77 (9th Cir. 1996).

13       The government will establish the authenticity, accuracy, and trustworthiness of

14  the January 2015 recorded interview through Special Agent Gromer, who was present

15  during the entire January 13 interview and can identify the voices of all the participants.

16  Similarly, the government will establish the authenticity, accuracy, and trustworthiness of

17  the July 2007 recorded conversations through Detective Humphries, who was present

18  during both conversations and can identify the voices of all the participants.  Finally, as

19  noted above, the government will establish the authenticity, accuracy, and trustworthiness

20  of the recorded FDC calls through B.M., who was present during these phone calls and

21  can identify her voice and the voice of the Defendant.

22  **L.**   **Use of Transcripts**

23       The government has prepared transcripts of the January 13 interview of the

24  Defendant, the July 2007 conversations between the Defendant and Detective Humphries,

25  and certain recorded FDC calls, and has provided these transcripts to the defense during

26  discovery.  The government intends to provide jury members with a copy of these

27

28

GOVERNMENT'S TRIAL BRIEF - 35
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  transcripts that they can read, if they choose, while relevant excerpts of the recordings are

2  being played.

3        The Ninth Circuit approves the use of transcripts of properly admitted tape

4  recordings to aid the jury in understanding the recordings.  *United States v. Rinn*, 586

5  F.2d 113 (9th Cir. 1978); *United States v. Taghipour*, 964 F.2d 908 (9th Cir. 1992);

6  *United States v. Pena-Espinoza*, 47 F.3d 356 (9th Cir. 1995); *United States v. Armijo*, 5

7  F.3d 1229 (9th Cir. 1993).  The Ninth Circuit also has approved of the use of transcripts

8  during deliberations, under certain circumstances.  *United States v. Turner*, 528 F.2d 143,

9  168 (9th Cir. 1975); *United States v. Fuentes-Montijo*, 68 F.3d 352, 353-55 (9th Cir.

10  1995).

11        The government has submitted a Ninth Circuit pattern jury instruction, to be read

12  to the jury prior to their receipt of the transcripts, which advises them of the following:

13  (1) that the recording itself is the evidence, (2) that the transcript is only a guide, and (3)

14  that if there are any discrepancies between the two, the recording controls.  *United States*

15  *v. Turner*, 528 F.2d 143, 167-68 (9th Cir. 1975); Model Ninth Circuit Jury Instruction

16  2.7.

17  **M.**    **Use of the Victim's First Names at Trial**

18        The government has reviewed the Court's General Courtroom Rules and is aware

19  that unless otherwise permitted by the Court, counsel is to refer to all witnesses over the

20  age of 18 as "Mr." or "Ms."   In order to protect the victims' privacy interests, the

21  government seeks permission from the Court to refer to victims C.C., N.C., and B.M. by

22  their first names during direct examination and in opening statement and closing

23  argument.  Prior to testifying, B.M., C.C., and N.C. will all be sworn in and required to

24  state their full name for the record.

25        The government will introduce evidence at trial that during the times charged in

26  the Superseding Indictment, C.C., N.C. and B.M. engaged in commercial sex acts and

27  provided their earnings to the Defendant.  The government anticipates that each of the

28

GOVERNMENT'S TRIAL BRIEF - 36
*United States v. Powell*, CR15-244 RAJ

victims will testify that they are embarrassed about their involvement in the commercial

sex industry, that they found having sex with strangers to be traumatizing and/or

disgusting, and that they are extremely reluctant to discuss their intimate sexual acts in

front of strangers in a courtroom.   Moreover, each of these victims currently reside in

this judicial district and could conceivably come into future contact with jurors or other

courtroom personnel after their involvement in this case is over.  In light of the highly

sensitive nature of the victims' testimonies, and in order to protect the victims' privacy

and minimize their re-traumatization, the government respectfully asks this Court to

permit the parties to refer to C.C., N.C., and B.M. by their first names.

**N.    Proposed Courtroom Procedure Regarding Backpage.com Advertisements**

The government intends to introduce, during its case-in-chief, advertisements

featuring B.M. that were posted during the time she was trafficked by the Defendant.

Most if not all of the Backpage.com advertisements contain sexually explicit photographs

of B.M.  In order to minimize any embarrassment to B.M., and to avoid having sexually

explicit photographs displayed in the courtroom, it is the government's intention to

provide the jurors, the parties, the Court, and the testifying witness with a binder

containing unredacted versions of these advertisements to view when a witness is

discussing them.  The government will also have redacted copies of the Backpage.com

advertisements loaded onto the Sanction courtroom presentation program in the event

that it is necessary to use that program when discussing these exhibits with a witness.

The government has used this procedure in other cases involving sex trafficking, most

recently in *United States v. Bonds*, CR14-74-JCC.

**O.    Defendant's Prior Convictions**

Consistent with the Court's prior ruling, the government intends to elicit evidence

of (1) the Defendant's 2007 conviction for Attempted Pandering in Clark County,

Nevada and (2) his 2008 conviction for Assault with a Deadly Weapon in Orange

County, California, to demonstrate his intent, knowledge, and absence of mistake.  If the

GOVERNMENT'S TRIAL BRIEF - 37
*United States v. Powell*, CR15-244 RAJ

Defendant chooses to take the stand and testify, these convictions will also be admissible as impeachment evidence. Federal Rule of Evidence 609 governs the impeachment of a defendant with prior convictions. Rule 609(a)(1) allows a defendant to be impeached with a prior criminal conviction if (1) the crime was punishable by more than one year in prison and (2) the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused. The government submits that evidence of the above-described convictions both are admissible pursuant to this rule.

The Ninth Circuit has outlined five factors to consider in balancing the probative value of a prior conviction against its prejudicial impact: (1) the impeachment value of the prior crime; (2) the date of the prior convictions and defendant's subsequent criminal history; (3) the similarity between the past crime and the charged crime; (4) importance of the defendant's testimony; and (5) the centrality of the defendant's credibility. *United States v. Alexander*, 48 F.3d 1477, 1488 (9th Cir. 1995); *see also United States v. Cook*, 608 F.2d 1175, 1185 n.8 (9th Cir. 1979) (en banc), overruled on other grounds, *Luce v. United States*, 469 U.S. 38 (1984).

The government should be permitted to impeach the Defendant on cross-examination with the two convictions listed above. First, the Defendant's prior felony convictions have significant impeachment value. As this Court noted when analyzing whether evidence regarding these prior bad acts should be admitted pursuant to Federal Rule of Evidence 404(b), the prior convictions "go to prove a material point, that being, that the defendant intended for C.C., N.C., and B.M. to engage in acts of prostitution, expecting them to give him their earnings from prostitution and offer protection in exchange for their acts of prostitution." *See* Docket No. 111 at 2. The evidence also establishes the Defendant's *modus operandi*. *Id.* Second, the timing of the convictions, and Defendant's subsequent criminal history, favor admission. Third, the prior convictions involve strikingly similar conduct as that charged here – namely, the Defendant's online recruiting of an undercover officer for prostitution and his intent to

GOVERNMENT'S TRIAL BRIEF - 38
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  transport her across state lines for the purpose of prostitution, as well as the Defendant's

2  prior incident of violence in connection with the commercial sex industry.   Fourth, the

3  importance of Defendant's testimony and the centrality of his credibility cannot be

4  overestimated.   The Defendant's credibility will be a crucial issue in the case – and the

5  jury will be required to balance his credibility and the reasonableness of his explanation

6  against the government's evidence.

7        Thus, each of the five factors weighs heavily in favor of allowing such

8  impeachment evidence.   The probative nature of the evidence clearly outweighs its

9  prejudicial effect.  *See* Docket No. 111 (holding, in Rule 404(b) context, that "the

10 probative value of the proffered evidence to establish intent and motive is high").   Prior

11 to impeaching Defendant with these prior convictions, the government will seek a ruling

12 from the Court that such evidence is admissible pursuant to Rule 609(a)(1).

13 **P.     Exclusion of Witnesses**

14        Pursuant to Rule 615 of the Federal Rules of Evidence, the government

15 respectfully requests that witnesses be excluded from the courtroom, with the exception

16 of Seattle Police Department Detective Maurice Washington, who is case detective.

17 *United States v. Thomas*, 835 F.2d 219, 222-23 (9th Cir. 1987); *see also United States v.*

18 *Machor*, 879 F.2d 945, 953-54 (1st Cir. 1989).

19 **Q.     Items Raised in Defense Trial Brief**

20        The defense has filed a trial brief addressing three issues that may arise at trial.

21 The government responds to the defense's argument as follows:

22        **1.     Evidence Regarding B.M.'s Employment History at Radio Shack**

23        Before she met the Defendant, B.M. was employed from February 2012 to July

24 2013 as a salesperson at a Radio Shack store.   The defense has subpoenaed B.M.'s

25 employment records from Radio Shack, which includes an incident report of merchandise

26 theft by B.M. on June 28, 2013.   When questioned by the store's investigator several days

27 later, B.M. admitted to stealing approximately $2,879 worth of iPads and iPhones from

28

GOVERNMENT'S TRIAL BRIEF - 39
*United States v. Powell*, CR15-244 RAJ

1   her employer.  B.M. further stated that her boyfriend Alex had convinced her to steal the

2   items, and that she had given them to him.  B.M. told the investigator that her boyfriend

3   was working to recover the stolen merchandise.  However, B.M. never returned the items

4   or refunded the store the value of the merchandise.  B.M.'s last paycheck from Radio

5   Shack was issued on July 9, 2013.  The employment records do not indicate the reason

6   why B.M.'s employment ended, although the government agrees that it is a fair inference

7   that the theft investigation likely played a role.

8          During an interview with Detective Masur on January 13, 2015, B.M. made a brief

9   reference to her job at Radio Shack.  Specifically, she told Detective Masur about a

10  previous experience in which law enforcement officers in the Seattle area had "genuinely

11  wanted to help" her get out of prostitution.  B.M. said that she had cooperated in that case

12  and she "got the help and support I needed."  *See* Transcript of January 13, 2015

13  Interview with B.M., produced to the defense at Bates 2254-55.  When Detective Masur

14  asked her what had gotten her back into prostitution, B.M. replied:  "Went and got a job.

15  Lost my job.  Lost my apartment.  Lost everything.  My life went to shit."  *Id.*

16         The defense contends that B.M.'s statement that she "lost [her] job" at Radio

17  Shack was "misleading and dishonest" and was made to "avoid being charged with

18  prostitution by creating the impression that she was a victim of events beyond her

19  control."  Defense Trial Brief at 2-3.  This characterization of B.M.'s statement as

20  "dishonest" and intended to manipulate the detective is both wrong and completely

21  unsupported by the facts.

22         First, the government disagrees that B.M.'s statement that she "lost" her job is

23  misleading or dishonest.  B.M. did not state or suggest that she was "laid off without

24  reason or arbitrarily 'let go.'"  Defense Trial Brief at 3.  Nor did she state or suggest that

25  the loss of her job was due to "events beyond her control" or that her actions had nothing

26  to do with why she lost her job.  B.M. simply said, in response to Detective Masur's

27  question about how she started working as a prostitute again, that she had lost her job and

28

GOVERNMENT'S TRIAL BRIEF - 40
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   apartment, and her "life went to shit."  The defense's attempt to portray this statement as

2   misleading and manipulative simply is not supported by B.M.'s actual words.  And there

3   is no evidence that these statements were designed to engender sympathy from the

4   detective or avoid prosecution.

5    Furthermore, even if B.M. had made a definitive misstatement as to how she came

6   to lose her job (if, for example, she had said that she was let go as part of a reduction in

7   force), any impeachment value would be substantially outweighed by the extreme

8   prejudicial effect such evidence would have.  Given that B.M. was not convicted of theft,

9   she could only be impeached by this incident if it meets the requirement of Rule 608(b),

10  which states that "specific instances of the conduct of a witness, for the purpose of

11  attacking or supporting the witness's character for truthfulness . . . may [] in the

12  discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on

13  cross-examination of the witness concerning the witness' character for untruthfulness."

14  *See* Federal Rule of Evidence 608(b).

15   B.M.'s theft of merchandise is not probative of truthfulness or untruthfulness and

16  thus is not admissible.  Indeed, the Ninth Circuit has previously held, in the context of a

17  Rule 609 analysis, that " generally, . . . theft crimes, and crimes of stealth do not involve

18  'dishonesty or false statement' and are thus not automatically admissible to impeach the

19  credibility of a witness; although such crimes may indicate a lack of respect for the

20  persons or property of others, they do not bear directly on the likelihood that the witness

21  will testify truthfully."  *See United States v. Glenn*,  667 F.2d 1269, 1273 (9th Cir. 1982).

22  This is particularly true where B.M. apparently admitted wrongdoing when confronted.

23  Given that evidence regarding B.M.'s theft from Radio Shack would have minimal to no

24  relevance to her credibility as a witness, but would certainly result in unfair prejudice to

25  the government (and cause unnecessary embarrassment for B.M.), it should be excluded.

26  The cases cited by the Defendant – which involve *Brady* violations rather than an

27

28

GOVERNMENT'S TRIAL BRIEF - 41
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  analysis regarding whether Rule 608(b) permits impeachment of a witness through

2  specific instances of conduct – do not compel a different result.

3      **2.      Evidence Regarding B.M.'s Statements Regarding California**

4      As set forth above, on January 13, 2015, B.M. was interviewed by law

5  enforcement in Rapid City, South Dakota regarding the Defendant.  During these

6  interviews, law enforcement officers advised B.M. that they could connect her with

7  resources that could assist her in going home.  B.M. told law enforcement that she wanted

8  to go back to her mother's home in Washington State.  The government anticipates that

9  B.M. will testify that although she wanted to return to her mother's home, she and her

10 mother subsequently got in an argument over the telephone and her mother refused to

11 pick her up at the airport.  Frustrated, B.M. contacted one of the Defendant's friends, who

12 lived in California and whose number was saved in her cell phone's contact lists.  The

13 Defendant's friend agreed to let her stay with him in California, and suggested that she

14 tell the individuals who were arranging her trip to say that she was going to stay with her

15 brother or grandmother.  B.M. will admit that she made a false statement to law

16 enforcement when she told them that she was going to California to stay with her

17 brother.[7]

18     The defense contends that it should be permitted to cross-examine B.M. regarding

19 this false statement and this is the topic of its recent motion to reconsider.  If, as

20 anticipated, B.M. admits this falsehood during direct examination, any additional

21 questions on this topic would be cumulative and unnecessary.

22

23

24

25

---

[7] The defense makes sweeping assumptions regarding the effect of B.M.'s statement on the South Dakota law

26 enforcement officers.  Among other things, the defense states that the South Dakota law enforcement officers
"trusted that [B.M.] had told them the truth about wanting to go see her brother and were so convinced of her

27 honesty that they evidently made no effort to verify the matter further."  Defense Trial Brief at 9.  There is no
evidence in the record regarding the impact of B.M.'s statement on the South Dakota law enforcement officers'

28 decisions, nor would such evidence be relevant.

GOVERNMENT'S TRIAL BRIEF - 42
*United States v. Powell*, CR15-244 RAJ

3.      **Speculation Regarding the State of Mind of Others**

The defense asks that this Court to instruct the government to caution its witnesses against speculating against the Defendant's state of mind and/or intentions.  The government agrees that it is improper for a witness to speculate about the state of mind of another person.  The government may, however, ask a witness to describe the Defendant's demeanor or actions.

# VI.   CONCLUSION

The government is not aware of other legal issues that are likely to arise during the course of this trial.  If other issues do arise, the government will address those issues by way of a supplemental brief or briefs.

DATED this 2nd day of June, 2016.

ANNETTE L. HAYES
United States Attorney

*/s/ Catherine L. Crisham*
CATHERINE L. CRISHAM
AMY JAQUETTE
Assistant United States Attorneys
700 Stewart Street, Suite 5220
Seattle, Washington  98101
Phone: 206-553-8451
Fax:    206-553-0755
E-mail: catherine.crisham@usdoj.gov

GOVERNMENT'S TRIAL BRIEF - 43
*United States v. Powell*, CR15-244 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on June 2, 2016, I electronically filed the foregoing with the

3 Clerk of the Court using the CM/ECF system which will send notification of such filing

4 to the attorney(s) of record for the defendant(s).

5

6                                                   *s/ Catherine L. Crisham*

7                                                   CATHERINE L. CRISHAM
                                                    AMY JAQUETTE
8                                                   Assistant United States Attorneys

9                                                   700 Stewart Street, Suite 5220
                                                    Seattle, Washington  98101
10                                                  Phone: 206-553-8451

11                                                  Fax:     206-553-0755
                                                    E-mail: catherine.crisham@usdoj.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S TRIAL BRIEF - 44
*United States v. Powell*, CR15-244 RAJ